---

(No. 11089.—Reversed and remanded.)
R. B. STODDARD, Plaintiff in Error, *vs.* DANIEL KEEFE *et al.* Defendants in Error.

*Opinion filed April 19, 1917—Rehearing denied June 7, 1917.*

1. DRAINAGE—*commissioners owe duty to each land owner to keep ditch in repair.* Under the Farm Drainage act it is the duty of the drainage commissioners in constructing the improvement to make ample provision for an outlet for all waters properly draining through or into the drainage district, and said commissioners owe a continuing duty to each land owner to keep such work in repair and to see that all the lands, so far as practicable, shall receive their proper and equal benefits as contemplated when the lands were classified, if this can be done at a cost not exceeding the total benefits.

2. SAME—*duty of the commissioners to provide adequate outlet may be enforced by mandamus.* Land owners in a farm drainage district have a right to require the commissioners to adopt and construct a system of drainage which will provide main outlets of ample capacity to take care of the waters of the district, and if the system adopted has become inadequate the commissioners may be compelled by *mandamus* to deepen and widen the outlet so as to afford adequate drainage for the lands of the district, if it can be done at a cost not exceeding the benefits.

3. SAME—*right of land owner to enforce duty to keep ditch in repair is not defeated by delay or acquiescence.* Under the Farm Drainage act the duty of the drainage commissioners to keep the

ditch effective and in repair is a continuing duty, and the bar of the Statute of Limitations, acquiescence or *laches* cannot be availed of to defeat the right of the land owner to enforce such duty, in the absence of special circumstances showing it would be unjust or inequitable to grant the relief asked.

4. SAME—*when land owner seeking to compel commissioners to deepen and widen outlet for district shows right to relief.* A land owner in a farm drainage district seeking to compel the commissioners to deepen and widen the outlet for the district need not furnish the commissioners with plans for the work, and he has established his right to relief when he has shown that the outlet in its present condition does not afford adequate drainage and that an adequate outlet can be provided at a cost which will not exceed the total benefits to the lands of the district.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Whiteside county; the Hon. FRANK D. RAMSAY, Judge, presiding.

M. A. STIVER, and CLYDE SMITH, for plaintiff in error.

CARL E. SHELDON, for defendants in error.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the court:

Plaintiff in error, R. B. Stoddard, filed his petition for *mandamus* in the circuit court of Whiteside county against defendants in error, Daniel Keefe, Francis O'Neil and Walter Cooney, drainage commissioners of Drainage District No. 1 of Hahnaman township, in that county, to compel them, as such drainage commissioners, to deepen, widen and straighten a certain portion of the drainage ditch, being its outlet into Green river, so that the same would be of sufficient depth, width and capacity to furnish ample and sufficient drainage for plaintiff in error's land. Defendants in error answered the petition, and later a stipulation was entered into that any evidence might be received on the hearing which would be competent and admissible under

proper pleadings. A jury was waived and the cause tried before the court, which rendered a judgment in favor of defendants in error. An appeal was prosecuted to the Appellate Court for the Second District, where the judgment of the lower court was affirmed. On the petition of plaintiff in error a writ of *certiorari* was awarded, and the cause is now in this court pursuant to the mandate of such writ.

Drainage District No. 1 of Hahnaman township was organized as a drainage district on August 16, 1881, under the Farm Drainage act. As originally established the main ditch was about seven and a quarter miles in length and intended to drain approximately 7000 acres of land embraced in the drainage district. The ditch, at its lower end, extends in a north and south direction for a distance of about two miles between sections 28, 29, 32 and 33 in Hahnaman township, in Whiteside county, and thence south about half a mile between sections 4 and 5 in Greenville township, in Bureau county, where it empties into Green river. About two and a half miles above its mouth it is crossed by the tracks of the Chicago, Burlington and Quincy Railroad Company, which road runs in a northwesterly direction across above mentioned sections 28 and 29. That part of the ditch in Bureau county was not included in the drainage district proper but was acquired by it as an outlet. Plaintiff in error's land is situated in the east half of section 32, in Hahnaman township, Whiteside county. The portion of the ditch which it is proposed to enlarge and deepen extends from the Chicago, Burlington and Quincy tracks south to its mouth, where it empties into the Green river, a distance of about two and a half miles. At the time the drainage district was organized and the lands in the district classified the land in question was owned by Phœbe Carter. The east half of the section was classified at 90 points and the west half at 70 points on the classification roll of the lands of the district. From the rate of classification it is evident that the commissioners believed

this land would be among those most benefited by the improvement and assessed them accordingly. There is evidence tending also to show that at the present time the land is receiving practically no benefit from the improvement, especially in wet seasons, when proper drainage is most needed. Shortly after the district was organized an assessment was levied and a dredge ditch constructed about twenty-five feet in width, and, so far as the evidence shows, all assessments levied against this land have been paid by its respective owners, including plaintiff in error. On December 12, 1893, another drainage district, known as Union Drainage District No. 2, was organized and secured the privilege of connecting its ditches with the one in question so as to afford an outlet for the waters of such district. On March 15, 1895, another drainage district, known as Harmon and Montmorency Union District No. 1, was organized, and on July 14, 1898, was granted permission to make an outlet into the ditch in question. On February 3, 1897, still another district, known as Union District No. 1 of Harmon and Marion townships, was organized and granted permission for an outlet through this ditch. All of these districts carry their waters into this ditch through open ditches which are nearly as large as the ditch in question. The ditch in the Harmon and Montmorency district is about four and a half miles in length and eighteen feet in width, with three and a half miles of lateral ditches twelve feet in width, and that in the Harmon and Marion district is approximately eight miles in length and eighteen feet in width and has over four and a half miles of lateral ditches emptying into it, each of a width of approximately ten feet. The lands drained by these ditches were formerly covered with water from two to three weeks at a time, but since the ditches have been constructed the water drains off in from one to two days. All told, more than twenty miles of open ditches, draining approximately 16,500 acres of land, have, in effect, been added to the district and permitted to empty

into the main ditch of defendants in error, originally constructed to form drainage for approximately 7000 acres. The effect of this has been that in wet seasons a larger amount of water is collected and emptied into this main ditch in such a short time that it is unable to carry it off, with the result that it either overflows its banks or breaks through them and overflows onto plaintiff in error's land, so that at times from 100 to 200 acres of his land are submerged at a time.

When the ditch was originally constructed the dirt removed from the main channel was piled along its sides, forming dikes or levees. Dikes also were constructed along the banks of Green river, into which the ditch empties. The dikes along the river are now some three or four feet higher than those along the sides of the ditch, so that when Green river is high the water backs up into the ditch and at times overflows its banks or breaks through the dikes and floods the lands of plaintiff in error. The evidence on the part of plaintiff in error tends to show that this occurs, in part, because the main ditch is too narrow and its banks too low to confine such waters as are now drained into it within its banks and hold them until such time as they may be discharged into Green river. There is also evidence tending to show that the ditch intercepts an old natural channel a few rods south of the tracks of the Chicago, Burlington and Quincy Railroad Company, and that the banks or dikes originally constructed along the sides of the ditch at such place have been washed down so that they are now level with the surrounding lands, and that the water escapes through breaks in the dikes as soon as it is from four and a half to five feet deep in the ditch and overflows on the lands in question. In fact, all of the evidence on the part of plaintiff in error tends to show that the cause of the overflow is by reason of the ditch in question not being wide enough and deep enough to carry the water which is drained into it, and a plan is suggested for

widening and deepening the ditch, using the earth removed for the purpose of building new dikes or levees along its sides, which it is claimed will cure the defects and afford ample drainage for all the lands of the district at an estimated cost of about $12,000. The evidence of defendants in error tends to show that the conditions complained of are caused by a variety of reasons, such as the water backing up from Green river into the main ditch; the failure of traps on a tile ditch on plaintiff in error's lands to check the in-take because being out of repair; the banks or dikes along the sides of the ditch getting out of repair by reason of muskrats digging into them, and other causes which allow the water to break through at various places. They say it would be impossible for the water which comes from the north to overflow plaintiff in error's land as claimed by his witnesses, and that to construct the improvement as suggested by him would be of doubtful benefit to his land and the other lands in the district.

Whatever the cause or causes of the overflow, the one fact which stands out prominently is that plaintiff in error's land has been assessed and its owner has paid for the construction of an improvement which at the present time is of practically no benefit to his land, and that the primary cause of this seems to be an inadequate outlet to provide for the waters which have been collected and permitted to empty into the main ditch since it was originally constructed. It was the duty of the commissioners in constructing the improvement to make ample provision for an outlet for all waters properly draining through or into the district. Section 17 of the Farm Drainage act provides that the commissioners shall go upon the land and determine upon a system of drainage "which shall provide main outlets of ample capacity for the waters of the district, having in view the future contingencies, as well as the present," and that preference is to be given tile drains when

they will accomplish the purpose. Section 41 requires the commissioners, after the work has been completed, to keep it in repair, and if they find, by reason of error in locating the ditches, or any of them, "or from any other causes the lands of the district are not drained or protected as contemplated, or some of them receive partial or no benefit, they shall use the corporate funds of the district to carry out the original purpose to the end that all the lands, so far as practicable, shall receive their proper and equal benefits as contemplated when the lands were classified." The duty imposed by this section is one owing to each land owner in the district. It is a continuing duty, and it is not discharged until a ditch has been constructed of sufficient capacity to afford ample drainage for all of the lands in the district that have been assessed for the construction of the improvement, if this can be done at a cost not exceeding the total benefits to the lands in the district. These provisions of the statute are mandatory, and we have repeatedly held that where the land owners of a district have been assessed and taxed for the construction of drains and ditches for their lands and the ditches or drains as constructed have proven inadequate for the purpose for which they were intended, the land owners have a right to require the commissioners to adopt and construct a system of drainage which will provide main outlets of ample capacity to take care of the waters of the district; also, if the system of drainage adopted is not of sufficient capacity to afford proper drainage for all the lands of the district, that the commissioners may be compelled, by *mandamus,* to deepen and widen the outlet or otherwise improve the same so as to afford adequate drainage for the lands of the district if it can be done at a cost not exceeding the benefits accruing to the lands in the district. (*Peotone Drainage District v. Adams,* 163 Ill. 428; *Langan* v. *Milk's Grove Special Drainage District,* 239 id. 430; *People* v. *Garner,* 275 id.

228; *Adolph* v. *Commissioners of Drainage District,* 276 id. 483.) We think plaintiff in error's evidence has brought his case within the rule announced in these cases.

In *People* v. *Garner, supra,* one of the objections urged to the application for judgment for the delinquent drainage assessment was that the ditch as constructed failed to furnish an ample outlet for the waters of the district, and for this reason the lands of the objectors were not benefited to the amount of the assessment levied against their lands. That fact seemed to be admitted, but it was not shown the lands would not be benefited as much as they were assessed if proper outlets were constructed. We there held the objection not well taken, for the reason that the land owners had a right to compel the drainage commissioners to provide an adequate outlet for the waters of the district by *mandamus* and the objection to the tax was overruled. It was there said, on page 233 of the opinion: "On the application for judgment the delinquent list filed by the collector is *prima facie* evidence that the lands will be benefited to the amount stated in the list, and it is not enough to show that the property has not yet received that amount of benefits. It is sufficient if it will receive the benefits from the improvement when completed. Inadequacy of outlet is not sufficient to justify the refusal of judgment unless it appears that the outlet cannot be made adequate for an amount equal to the benefits to the land affected. (*People* v. *Welch,* 252 Ill. 167.) The provisions of the Farm Drainage act requiring drainage commissioners to provide outlets of ample capacity for the waters of the district are mandatory, and land owners who have been assessed for the purpose of constructing drains or ditches to drain their lands may compel the commissioners to deepen and widen the outlet so as to provide main outlets of ample capacity for the waters of the district. (*Peotone Drainage District* v. *Adams,* 163 Ill. 428; *Langan* v. *Milk's Grove Special Drainage District,* 239 id. 430.) The evidence tends to

show that the completion of the work in the Rector Special Drainage District did not accomplish the results that were expected; that the outlet of the system of drainage had not the capacity to carry off with sufficient speed the quantities of water that were brought down with greater rapidity than before. For this reason the lands of the appellants have not received the benefits to which they are entitled. Section 41 of the Farm Drainage act was adopted to meet emergencies of this character." And on page 235 of the opinion it was further said: "The burden was on the appellants to show that their lands would not be benefited to the extent of the assessment by the construction of the improvement. They have not sustained that burden. They have shown that their lands are not now benefited, but the evidence does not justify the conclusion that a sufficient outlet, which the drainage district can be compelled to furnish, will not benefit the lands to the amount of the assessment." What is there said is controlling here, and sustains plaintiff in error's right to the relief asked, in the absence of a showing that the cost of the improvement contemplated will equal or exceed the benefits to be derived by the lands of the district from its construction. We find no proof of such fact in the record.

It is next urged that plaintiff in error is barred of his remedy by *mandamus* by reason of his *laches* in bringing the action or by the five-year Statute of Limitations, and that he has failed to show that the construction of the improvement in the manner contemplated by his petition is practicable and will afford a ditch adequate to drain the lands of the district and relieve his land from the burdens complained of. As to the first proposition, the statute makes it the duty of the commissioners, in the first instance, to construct a main ditch of such capacity as to afford adequate drainage for the lands in the district, taking into consideration the future as well as the present needs of the district, and after it is constructed to keep and main-

tain it in such condition of repair as to continually afford adequate drainage for all the lands of the district. As we read the evidence, the ditch originally constructed, at least for a considerable time, afforded adequate drainage for all the lands of the district, and it is only within the last few years, and more particularly in wet seasons, that it has not had the capacity or been in condition to carry off water so as not to interfere with plaintiff in error's proper cultivation of his land. There is also evidence tending to show that other ditches draining into it have recently been cleaned out, enlarged and deepened and their capacity for carrying a large volume of water in a short time increased but that no substantial improvements of any kind have been made in the portion of the ditch in question, which must afford an outlet for such waters. There is also evidence tending to show that this ditch has filled in to some extent, and that the conditions complained of are due, in part at least, to a filling up of the ditch and the washing away of the banks or dikes originally constructed along its sides. In this condition of the proof we think it must be said that the conditions complained of are due as much to a want of proper repairs in the ditch as anything else. If this is so, plaintiff in error has a right to insist that it be placed in proper condition of repair and in such condition as to take care of the waters drained into it, and it is the duty of the commissioners to at least attempt to put the ditch in proper condition. The statute makes it their duty to maintain the ditch in proper repair. This is a continuing duty, and the bar of the Statute of Limitations, acquiescence or *laches* cannot be availed of to defeat the action of plaintiff in error, in the absence of special circumstances showing it would be unjust or inequitable to grant the relief asked. No facts are shown which would authorize any such holding in this case.

As to the other proposition, the statute invests the drainage commissioners with the power to lay out and construct

the drainage ditches.   It also confers upon them authority
to employ engineers for the purpose of assisting them in
the matter, and makes it their duty, in laying out such a
system of drainage, to adopt such a plan as will afford an
adequate and sufficient outlet for the present and future
needs of the drainage district.   It also makes it the duty
of the commissioners, whenever they find the lands of the
district are not receiving proper drainage, to remedy such
defect so far as practicable, to the end that all the lands
in the district, and each tract, shall receive its equal bene-
fit as contemplated at the time the lands were classified.   It
was not the duty of plaintiff in error to provide and fur-
nish the drainage commissioners with the necessary plans
and specifications for doing the work necessary to be done
for such purpose, and if he attempted to furnish such plans
to the commissioners they would be under no obligation
to adopt them.   The commissioners are vested with a dis-
cretion in determining the manner in which an adequate
system of drainage is to be provided and in which it shall
be brought about.   This discretion cannot be controlled by
the land owners.   All they can insist upon is that the sys-
tem adopted shall be such as to afford adequate drainage
for the lands of the district.   Plaintiff in error has estab-
lished his right to the relief asked when he has shown that
the ditch in its present condition does not afford such an
outlet as will afford adequate drainage for the lands of the
district and that such an outlet can be provided and at a
cost which will not exceed the total benefit to the lands
of the district.   We think that plaintiff in error has estab-
lished this fact by the evidence and that the circuit and
Appellate Courts erred in denying him the relief prayed for.

For the reasons given, the judgments of the Appellate
and circuit courts will be reversed and the cause remanded
to the latter court, with directions to grant plaintiff in er-
ror the relief asked.

*Reversed and remanded, with directions.*