## L. J. Kendall et al., Appellants, v. A. M. Montgomery et al., Appellees.

## Gen. No. 6,925.

1. DRAINAGE—*duty of commissioners under Farm Act*. The purpose of the Farm Drainage Act is to furnish adequate drainage to all lands within the district, provided the costs are within the benefits, and the duty placed upon the commissioners by section 17 (Cahill's Ill. St. ch. 42, ¶ 137), to go upon the land and determine the system of drainage, having in view the future as well as present contingencies, is not only placed on them while they are laying out and installing the system, but it remains after completion and operation, and if the original plan is not sufficient to afford proper drainage, it is the duty of the commissioners to make the system adequate so that all of the lands will be drained.

2. DRAINAGE—*duty of commissioners under Farm Act to repair or improve system*. Section 41 of the Farm Drainage Act (Cahill's Ill. St. ch. 42, ¶ 163), requiring that the commissioners after completion of the work shall keep it in repair, and if by reason of error in location or for any other cause the lands are not drained or protected as contemplated, the commissioners shall use the corporate funds to carry out the original purpose to the end that all lands, so far as practicable, shall receive their proper and equal benefits as contemplated when they were classified, has been construed to mean that the duty imposed by this section is one owing to every landowner in the district, and that it is not discharged when a system is first installed, but continues until a system is established which affords ample protection to every landowner who has been assessed, provided the cost does not exceed the benefit.

3. MANDAMUS—*sufficiency of petition to compel farm drainage commissioners to enlarge and repair ditch*. A petition for mandamus against farm drainage commissioners to compel them to enlarge the capacity, clean out and repair certain ditches in the district was sufficient to require the defendants to plead, and their demurrer was improperly sustained, where it was alleged that the lands of petitioners were not drained as contemplated and had received only partial or no benefits, and that changes could be made which would drain the lands and that the cost would be within the benefits, and that after repeated demands for adequate drainage the commissioners had failed to give relief.

4. MANDAMUS—*petition as invasion of discretion of farm drainage commissioners*. A petition to compel farm drainage district

commissioners to grant relief against the conditions complained of did not invade the discretionary powers vested by statute in the commissioners by dictating the specific form of relief to be given, where, although the manner in which relief might be given was suggested, the prayer was simply that the commissioners be required to enlarge the outlet and clean out the ditches so as to afford the lands of petitioners outlet to drain their lands.

Appeal from the Circuit Court of Bureau county; the Hon. JOE A. DAVIS, Judge, presiding. Heard in this court at the April term, 1921. Reversed and remanded with directions. Opinion filed November 2; 1921.

M. A. STIVER and CLYDE SMITH, for appellants.

JOSEF T. SKINNER and J. L. SPAULDING, for appellees.

MR. JUSTICE PARTLOW delivered the opinion of the court.

Appellants, seven in number, filed their petition in the circuit court of Bureau county against appellees as commissioners of the Green River Special Drainage District of Bureau and Whiteside counties, for a mandamus commanding appellees to enlarge the capacity, clean out and repair certain ditches in said district. A general and special demurrer was sustained to the petition. Appellants elected to abide by their petition and thereupon judgment was entered against them and this appeal was prosecuted.

The petition alleges, in substance, that appellants were landowners in said district; that the district was organized June 15, 1893, under the Farm Drainage Act for the purpose of constructing drainage for agricultural and sanitary purposes by special assessment upon the property benefited, and the district embraced 13,839 acres of land. The commissioners determined upon a system of drainage which was considered sufficient to provide outlets of ample capacity for the future as well as present contingencies. One

main ditch and several laterals were constructed, the main ditch being an improved portion of Green river, and, as originally constructed, the maximum width of the main ditch on the bottom was 50 feet. On May 24, 1906, the commissioners determined that the drains originally designed would not be adequate for the purpose of draining the district; that the ditches had become considerably impaired, and that heavy and additional volumes of water came upon the lands of the district because of improvements in drainage in the lands above the district and thereupon the commissioners caused certain changes to be made. The first 6,800 feet of the main ditch, extending from its upper terminus, was given a bottom 60 feet in width; the next 5,500 feet was given a bottom of 65 feet, and the remainder of the course, down to the canal aqueduct, was given a bottom of 70 feet in width.

The petition further alleged that the main ditch as originally constructed contained a section wherein a new channel was excavated, beginning at a point in the northwest quarter of section 33 in Greenfield township, and running in a southwesterly course to a point where it again connected with the main channel of Green river and was designated as the old cut-off. In 1906 the old cut-off was not widened, nor was its capacity increased to take care of the water which was brought down in the ditch which was widened to a 70-foot bottom, but the old channel was widened from where it departed from the cut-off to where it again joined the cut-off to a width of 70 feet on the bottom. This section of the old channel runs in a northwesterly direction to the Village of New Bedford, and then curves in a southwesterly direction until it connects with the old cut-off and it is known as the New Bedford cut-off. The old cut-off is a little more than a mile in length and the New Bedford cut-off is about three miles in length. The petition further alleged that the New Bedford cut-off had not been maintained

in good condition since 1906, but the current having to travel farther than in the old cut-off, and in a less direct course, and with more friction, and on a grade decreased corresponding with its increased length, had become sluggish and filled with deposits of sand, dirt and with a growth of willows and brush, and at its head had become sealed to a height of 5½ feet above its bottom, so that its water must rise to that height before it can run through the New Bedford cut-off. Great volumes of water came down the main ditch to the junction of the cut-offs. Green river is about 100 miles in length and its head waters are in *Willow Creek* township on the east side of Lee county, thence through the southern portion of Whiteside county and through Bureau and Henry counties and empties into Rock river near the Village of Colona in Henry county. From about the center of Lee county it has a width of 60 feet on the bottom until it enters Green River Special Drainage District, which is about midway between the head and mouth of Green river. That portion of Green river above the drainage district is the only outlet for 250,000 acres of land and the waters from this watershed are brought down through Green river and empty into the main ditch of the drainage district. Green river is fed by a great many natural streams, bringing down water which surrounds its basin; and by improved ditches constructed by other drainage districts, among which is the Inlet Swamp Drainage District, embracing about 35,000 acres in Lee county, and having more than 55 miles of drainage ditches.

The petition further alleged that the outlet for the waters from the lands of appellants was above the junction of the cut-offs at their upper portion into the main ditch, and from the cut-offs to its upper terminus in Whiteside county the ditch is filled with sand bars and other obstructions which have accumulated there since the ditch was improved in 1906. The main

ditch has not been cleaned out since 1906 and is out of repair and filled in many places to a depth of 5 feet or more, its original depth being an average of 10 feet. The water of the main ditch is retarded and is backed upon the land of the appellants to such an extent as to deprive lands of drainage. This condition may be remedied by cleaning out the main ditch from its upper terminus to the canal feeder about 2 miles below the lower district boundary of the district on a grade which would give a fall of over 11 feet in 9½ miles; and by widening the old cut-off to a width of 75 feet on the bottom. The capacity could be sufficiently increased by cleaning out to a width of 70 feet and down to grade of the New Bedford cut-off.

The petitioner further alleges that the lands of the appellants have been classified and all assessments have been paid, but that the lands of appellants are not drained as contemplated and have received only partial or no benefits, and that the benefits to the land would not exceed the cost of securing the drainage; that appellants have made repeated demands upon the commissioners to remedy the conditions and to give them adequate and proper drainage, yet the commissioners have failed to afford the relief requested.

The prayer was for a writ of mandamus, commanding the commissioners to enlarge the capacity of the main ditch at the cut-off to such an extent as will make it adequate to carry the water which it was designated to carry, and to clean out and repair the main ditch so that it will afford an adequate and sufficient outlet for the drainage of the land of the appellants, and to take such steps as will give to the lands their equal and proper drainage, and such as was contemplated at the time of the formation of the district.

The special demurrer contained twenty-four specific grounds why the petition was not sufficient. When the demurrer was sustained the appellants moved the court to rule specifically on each ground of

demurrer, which the court refused to do.  There is nothing in the record to show upon what ground the demurrer was sustained, but we do not deem it necessary to pass on each reason assigned although each is separately argued.

The first ground of special demurrer is that there are no facts stated upon which the alleged duty of appellees to appellants can be predicated.  The first ground has been treated by the parties as a general demurrer and in the argument of this part many of the other causes of special demurrer were incidentally, if not necessarily, discussed, for the reason that these other causes of special demurrer are so connected with the questions involved that they cannot be separated. Other grounds alleged are that the petition does not show the classification of the land; or that appellants' lands have been assessed more than their share; or that the assessments have been levied or paid; or that this land has not received the benefit as originally contemplated; or what the cost of the work would be; or whether this cost would exceed the benefits; or that the work proposed would drain the land; or that the original work included any ditches 2 miles below the district.

The purpose of the Farm Drainage Act is to furnish adequate drainage to all lands within the district, provided the costs are within the benefits.  Section 17, ch. 42 (Hurd's Rev. St. 1919, page 1165, Cahill's Ill. St. ch. 42, ¶ 137), provides that the commissioners shall go upon the land and determine upon a system of drainage which shall provide main outlets of ample capacity for the waters of the district, having in view the future contingencies as well as the present.  This duty is not only placed on the commissioners while they are laying out and installing the system, but that duty remains after the system is completed, and after it is in operation, and if the original plan is not sufficient to afford proper drainage to the lands of the

district, it is the duty of the commissioners to make the system adequate so that all of the lands will be drained. Section 41 (Cahill's Ill. St. ch. 42, ¶ 163) provides that the commissioners, after the work has been completed, shall keep the same in repair, and if they find for any reason of error in locating the ditches, or any of them, or for any other cause, the lands of the district are not drained or protected as contemplated, or some of them received partial or no benefit, they shall use the corporate funds of the district to carry out the original purpose to the end that all land, so' far as practicable, shall receive their proper and equal benefits as contemplated when the lands were classified. The construction of this last *section* has been before the Supreme Court on several occasions and it had uniformly been held that the duty imposed by this section upon the commissioners is a duty which they owe to every landowner in the district. It is not discharged when a system of drainage is first installed, but the duty is continued until a system of drainage is established which affords ample protection to every landowner who has been assessed for the construction of the system, provided the cost does not exceed the benefit. It has also been held that this duty is mandatory and the landowners have the right to require the commissioners to adopt, *construct* and maintain a system of drainage which will provide a main outlet of ample capacity to carry off the waters of the district, and if the commissioners neglect or refuse to perform their duties they may be compelled by mandamus to do what the law provides they shall do. *Peotone & M. Drain. Dist. v. Adams,* 163 Ill. 428; *Langan v. Milk's Grove Spec. Drain. Dist.,* 239 Ill. 430; *People v. Garner,* 275 Ill. 228; *Adolph v. Drainage Dist. No. 2 Com'rs,* 276 Ill. 483; *Stoddard v. Keefe,* 278 Ill. 512. In *Adolph v. Drainage Dist. No. 2 Com'rs, supra,* it was held that the statute required ample outlet to drain the waters from the district, and

the commissioners could not shield themselves behind a discretionary power and leave the land without adequate drainage; that the statute requires the use of the corporate funds of the district for the purpose of correcting an error where the system adopted proves inadequate.

The petition in this case alleges that the district was organized for the purpose of draining the land; that a system of drainage was adopted and constructed; that the lands were classified; that all assessments have been paid; that the system constructed was inadequate and fails to drain the land; that changes can be made which will drain the land; that the costs of these changes will be within the benefits; that demand has been made upon the commissioners; that they have neglected and refused to act. The allegations of this petition come within the rules laid down in the cases above cited and were sufficient to require the appellees to plead, and the court was in error in sustaining the demurrer.

What has already been said practically covers all of the grounds of special demurrer, unless it be the twenty-second, in which it is alleged that the petition seeks the aid of this court in requiring the respondents to give the petitioners a specific form of relief. Upon an examination of the petition it will be found that there is no attempt made on the part of the appellants to dictate the specific form of relief which shall be given by the appellees. There is no attempt to invade the discretionary powers vested by the statute in the appellees. It is true that the petition suggests the manner in which the relief may be granted, but the prayer of the petition is simply that the appellees be required to enlarge the outlet and clean out the ditches in such a way as to afford the lands of appellant ample outlet to drain their lands.

For the errors indicated the judgment is reversed

and the cause remanded with directions to overrule the demurrer.

*Reversed and remanded with directions.*