THE PEOPLE *ex rel.* Joseph Mann, County Collector, Appellant, *vs.* W. C. ALLEN *et al.* Appellees.

*Opinion filed April 24, 1925.*

1. DRAINAGE—*the term "embankment" in a statute includes levees.* While every embankment is not necessarily a levee, a levee is always an embankment, and the use of the word "embankment" in a statute includes levees.

2. SAME—*Farm Drainage act, as amended in 1881, authorizes construction of levees.* The Farm Drainage act, as amended in 1881, (Laws of 1881, p. 87,) authorizes the construction of levees by a special drainage district organized under the act.

3. SAME—*meeting to hear objections to classification of lands may be held at county clerk's office although not within the district.* Under section 53 of the Farm Drainage act the meeting of the commissioners to hear objections to the classification of lands for an improvement in a special drainage district, where due notice is given, may be held at the office of the county clerk, although the county seat, where said office is located, is not within· the district.

4. SAME—*when excluding certain lands from classification does not render it void.* Although drainage commissioners have no authority to change the boundaries of a special drainage district, a refusal to classify certain lands because they receive no benefit will not render the entire classification void, as the commissioners are authorized to classify such lands at zero, and their action will be considered as having that effect.                 ·

5. SAME—*notice of hearing of objections to classification need not contain copy of petition for improvement.* Under section 23 of the Farm Drainage act the notice of the hearing of objections to the classification of lands for an improvement in a special drainage district need not contain a copy of the petition for ·the improvement.

6. SAME—*assessment may be made as soon as classification is confirmed.* An assessment for an improvement in a special drainage district organized under the Farm Drainage act may be made as soon as the classification of the lands has been corrected and confirmed, and a prior resolution stating that the amount levied is necessary to be raised by special assessment is not required to be entered in the drainage record, where the certificate returned to the county clerk and entered in said record is in the form required by statute.

7. SAME—*question of benefits in special drainage district may be raised in county collector's proceeding—estoppel.* Objections that no benefits are derived from an improvement in a drainage district are valid objections to an application for judgment for a delinquent assessment where the land owner has had no previous opportunity to be heard on the question, and as the appeal allowed by section 27 of the Farm Drainage act, as re-enacted in 1915, does not apply to special drainage districts, the question of benefits may be raised in the collector's proceeding, and payment of the first installment of the assessment will not estop the objectors from raising such question.

APPEAL from the County Court of Whiteside county; the Hon. WILLIAM A. BLODGETT, Judge, presiding.

ROBERT W. BESSE, State's Attorney, McMAHON & BELL, and McCALMONT & RAMSAY, for appellant.

W. C. ALLEN, and WOOD & McNEAL, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The county collector of Whiteside county applied to the county court for judgment and order of sale against certain lands situate in Whiteside and Rock Island Special Drainage District for delinquent installments of an assessment made by the drainage district. The land owners filed objections to the judgment, which were sustained except as to certain owners whom the court adjudged to have waived the right to object by the payment of a previous assessment. The collector appealed from the judgment in favor of the owners whose objections were sustained, and the owners whose objections were overruled appealed from the judgment against their lands. By agreement of the parties a single transcript of the record was filed, the appeals were argued together, and they have been considered and will be disposed of as one case.

The drainage district was organized in 1883 under the Farm Drainage act of 1879, (Laws of 1879, p. 142,) as amended in 1881, (Laws of 1881, p. 87,) as a special drainage district for the purpose of "constructing, repairing and

maintaining a drain and drains, a ditch and ditches, an embankment and embankments, a grade and grades and all, both and each within said proposed special drainage district for agricultural and sanitary purposes." The district consisted originally of 13,460 acres but has since been enlarged by the addition of new territory, so that it now embraces 16,402.23 acres, lying for the most part in the southwest part of Whiteside county but extending into Rock Island county. It lies between the Mississippi river on the west and the Rock river on the southeast, the greater portion of it to the west and northwest of the village of Erie, in Whiteside county. Between Erie and the village of Hillsdale, in the northeast part of Rock Island county, about six miles southwest of Erie, the Chicago, Burlington and Quincy railroad runs through the district at an average distance of a mile or a mile and a half from Rock river. The railroad is built upon a grade, in which there is an opening about a mile east of Hillsdale through which runs a slough extending south to the Rock river, known as the Meredocia and Docia. The slough extends north and northwest from the railroad, forming the boundary between Whiteside and Rock Island counties and joining a slough known as the Meredocia, which extends to the Mississippi. The land in its natural state was subject to overflow from the Mississippi river from the northwest, Rock river from the south and Rock creek from the east, but another drainage district on the northwest constructed a dike across the slough, which has since kept the water of the Mississippi river off the lands of the district involved in this suit. After the formation of the district sub-districts were organized, and dikes were constructed by this district and others adjoining which protected the lands of the district, other than those lying between the railroad embankment and Rock river, from overflow from Rock river and Rock creek from the east, except from backwater coming from Rock river through the openings in the railroad grade between

the villages of Erie and Hillsdale. Such backwater came upon the lands of the district frequently, and the assessment in question was levied to protect the lands from such overflow. In 1917 sixty-two land owners in the district presented a petition to the drainage commissioners reciting that they had learned of negotiations pending between the commissioners and the railroad company concerning a contract by which the company would allow the district to utilize the railroad road-bed from Erie southwest to the line between sections 14 and 15, about three miles, as a dike to prevent Rock river from overflowing the district, the company to fill all openings in the grade southwest of Erie and to keep said openings closed, and to put in and maintain suitable concrete pipe culverts in all other openings from the east line of section 15 to where the railroad grade crosses the highway running east from Hillsdale, the district to construct a dike from where the railroad intersects the east line of section 15 on the public highway south to where the highway turns west, thence on the public highway west to the high ground immediately east of the village of Hillsdale, and to remove the bridge on the highway across the Meredocia slough and substitute in its place a suitable culvert, with a proper floodgate that could be operated to keep Rock river from flowing into the district when the river is high and allow the water to flow out of the district into the river when the river is low, the dike to be constructed at such a grade that the top would be three feet higher than the top of the rails in the track of the railroad between its mile-posts 15 and 13, the district to bind itself to construct and maintain, for the purpose of facilitating the flow of water in the Meredocia slough, a new channel with thirty-foot bottom, forming an outlet for said slough into Rock river, and the district to hold the company harmless from claims brought against the company on account of closing up such openings or any of them. The petition requested that the commissioners enter into such a contract with the

company and proceed with the enterprise without delay. After the presentation of this petition the commissioners determined to proceed with the construction of the improvement, made a new classification of the lands of the district, levied an assessment of $84,697.18, and completed the work.

The objections filed by the land owners were originally eight in number, and subsequently by leave of the court seven additional objections were filed. On motion of the People some of the objections were stricken by the court, and the counsel do not agree as to whether some of the questions which have been argued were properly raised by the objections which remain or by the objections filed. Considerable space in the briefs is occupied by the discussion of these questions. It is not necessary to go into the consideration of them with reference to the ojections in detail, because we regard the questions which the objectors state in their reply brief to be the vital objections in the case as properly before the court. These questions are: Did the district have power to construct a levee? Did the law require the meeting to confirm the classification to be held in the district? Did the law require notice of the meeting to confirm the classification of new improvement to include a copy of the petition for changes on which the new classification was based? Did the voluntary and intentional act of the commissioners in cutting out forty acres, more or less, of the original district render the classification wholly void? Does the estoppel section apply to assessments that are void or only to those that are voidable? Can a curative act create a liability? Does section 27 of the Farm Drainage act as re-enacted extend to special drainage districts?

The act of 1879, under which the drainage district was organized, does not mention levees. Its title was, "An act to provide for the organization of drainage districts and to provide for the construction, maintenance and repair of drains and ditches by special assessments on property bene-

fited thereby." Section 3 prescribes the proceedings to be taken for the purpose of organizing a drainage district and requires a petition stating that the lands lying within the boundaries of the proposed district require a combined system of drainage or protection from overflow, and that the petitioners desire that a drainage district may be organized embracing the lands therein mentioned, for the purpose of constructing, repairing or maintaining a drain or drains, ditch or ditches, within said district for agricultural, sanitary or mining purposes, by special assessments upon the property benefited thereby. Probably to remedy what the legislature may have regarded as an oversight, this section was amended in 1881 so as to provide that the petition should state that the lands lying within the boundaries of the proposed district require a combined system of drainage or protection from wash or overflow; that the petitioners desire that a drainage district may be organized embracing the lands therein mentioned, for the purpose of constructing, repairing or maintaining a drain or drains, ditch or ditches, embankment or embankments, grade or grades, all or either within said district, for agricultural, sanitary or mining purposes, by special assessments upon the property benefited thereby.

The objectors insist that there is a plain distinction between the terms "levee" and "embankment," and that the former term always refers to a bank of earth which prevents the water from flowing from the district as well as from flowing into the district. We know of no foundation for such distinction. A definition of "embankment" given by Webster is: "A structure of earth, gravel, etc., raised to prevent water from overflowing a level tract of country, to retain water in a reservoir, or to carry a roadway, etc." Standard Dictionary: "A bank or dike cast up as to resist the encroachment of a river or the ocean or to preserve the level of a railroad or railway bed across a valley; loosely, any artificial bank or structure serving that purpose." A

317—7

"dike" is defined by Webster: "A mound thrown up to pre-
vent low lands from being inundated by the sea or a river;
a ditch; a channel for water made by digging; a bank, as
of earth, thrown up to form a barrier, line of demarcation
or the like, esp. an embankment to prevent inundation; a
levee." The Standard Dictionary defines a dike: "An em-
bankment thrown up usually to retain the waters of a stream
or to protect low lands from inundation; a dam; a bank;
levee." A "levee" is defined in Anderson's Law Diction-
ary as "an embankment intended to prevent inundation."
Webster gives the same definition; also, "a bank or cause-
way especially along a river to prevent inundation." Stand-
ard Dictionary: "An embankment beside a river or an arm
of the sea to prevent overflow, as in the Southern United
States." An embankment is not necessarily a levee, but a
levee is always an embankment. The use of the latter word
in the statute includes the former. The Farm Drainage
act, under which the district was organized, clearly author-
ized the construction of levees.

On August 7, 1919, a new classification of the lands
of the district was made and signed by the commissioners,
which was filed in the office of the county clerk, and notice
was given that on August 25, 1919, there would be a meet-
ing of the commissioners at the court house in Morrison,
the county seat of Whiteside county, to hear objections
that might be made to the classification. At this meeting
no written objections were filed but the commissioners were
requested to make certain corrections in descriptions and
names, which were made, and thereupon an order was made
and signed by the commissioners confirming the classifica-
tion. Morrison, the county seat, is not within the limits of
the district, and it is contended that the law required this
meeting to confirm the classification to be held in the dis-
trict. Section 53 of the Farm Drainage act provides in re-
gard to special drainage districts, "that the meetings of the
commissioners shall be held at the office of the county clerk

or at some place within such drainage district; provided, that meetings of the commissioners, except those of which notice is required to be given to the land owners, may be held beyond the boundaries of the district but within the county in which the district is organized at some place designated by an order duly made and entered in the records of the district as the regular meeting place of the commissioners and of the adoption of which meeting place a notice shall be published for three successive weeks in at least one newspaper in each county in which such special drainage district or a part thereof may be situated, and provided, further, that elections in special drainage districts shall be held within the boundaries of the district." Under the first clause which has been quoted any meeting of the commissioners may be held at the office of the county· clerk or at some place within the drainage district. The proviso modifies this clause not so as to prohibit meetings at the office of the county clerk or at any other place, but so as to authorize some meetings to be held at a place in the county beyond the boundaries of the district designated as the regular meeting place of the commissioners by an order duly made and entered in the records of the district, of the adoption of which the required notice shall have been published. Any meeting of the commissioners may be held at the county clerk's office or at some place in the district, and if the commissioners by an order entered in the records of the district, of the adoption of which notice has been published as required by the statute, have designated some place in the county outside the district as the regular meeting place of the commissioners, then any meeting may be held at that place except meetings of which notice is required to be given to the land owners, and such meetings must be held in the district or at the county clerk's office. The meeting was lawfully held at the county clerk's office in Morrison.

The record of the drainage commissioners shows that in making the classification the commissioners stated that

part of a forty-acre tract lying south of the railroad "is wholly without protection or benefit and is not considered as a part of the drainage district and is not classified and hereafter will not be considered as having any part or parcel within the boundaries of the said Whiteside and Rock Island Special Drainage District." It is argued by the objectors that the commissioners thereby detached that part of the land referred to from the district, and that this of itself made the classification void. The commissioners had no authority to change the boundaries of the district and the order had no such effect. Its effect on the classification was that the portion of land referred to was classified at zero. As a matter of form it would have appeared more regular to place the land in the classification scale under the figure zero, but so far as any effect on the scale was concerned it made no difference whether it was put in the scale at zero or the commissioners certified that it received no benefit and was therefore omitted.

Counsel for the objectors contend that the notice of the meeting to hear objections to the classification was defective, but the only objection made to it is that it did not contain a copy of the petition for the improvement. Section 50 of the Farm Drainage act is cited as sustaining the proposition that "notice of classification when contemplated improvement is different in nature from that for which the district was organized or that included in any former classification, must contain a copy of petition for improvement." That section does not refer to classification. The only notice it mentions is notice of the hearing of the petition for the organization of the district. That notice must contain a copy of the petition. The notice of the meeting to hear objections to the classification is prescribed by section 23 and was given in strict conformity with that section.

One objection made by the objectors is that a classification must be made by the commissioners and that this classification was not made by the commissioners, but all they

did was to approve a classification made by someone else. No evidence is referred to for the purpose of sustaining this charge. The record shows that on August 7, 1919, the commissioners met, all the members being present, for the purpose of adopting a new classification of lands of the district; that the district engineer was present, with maps, plats, plans and profiles bearing on the proposed classification and proposed system of protection of the lands against the waters of Rock river; that one of the commissioners moved that the classification, as shown by three separate documents marked A, B and C, be adopted as a classification of the lands of the district as a basis for future assessments; that the motion was seconded and carried unanimously. The documents were filed in the office of the county clerk, and there is no evidence to sustain the objection.

The objectors contend that the order of the commissioners must be entered in the drainage record in a special drainage district fixing the amount of assessment before an assessment can be made. If this means that a resolution fixing the amount required must be adopted before the commissioners can enter an order making the assessment it is contrary to the provisions of section 62 of the act, which provides that as soon as the classification has been corrected and confirmed it shall be competent for the commissioners to order such an amount of money to be raised by special assessment upon the lands of the district which are benefited as may be necessary according to the best judgment of the commissioners, which amount shall be certified and returned by the commissioners to the clerk, who shall record the same in the drainage record. The form of the certificate is fixed by the statute and the certificate was in the form required. A prior resolution was not required stating that the amount levied was necessary to be raised by special assessment. (*People* v. *Bentley,* 268 Ill. 470.) At a meeting of the commissioners held on July 9, 1920, it was resolved that a special assessment of $84,697.18 be levied

on the lands of the district to pay for the proposed new work according to the plans, profiles and specifications on file with the clerk, and on the same day the board made out the certificate required by section 62 of the Farm Drainage act that they required the sum of $84,697.18 to be levied as a special assessment or tax for drainage purposes on the lands and property benefited in the district.

Among the objections filed was one that the lands of the objectors received no benefit from the proposed improvement, and another that they were not benefited to the amount assessed. These were two of the objections which were stricken by the court on the People's motion, and this action has been assigned for error by the objectors. These are valid objections to an application for judgment for a drainage assessment where the land owner has had no previous opportunity to be heard on the question. (*People* v. *Welch,* 252 Ill. 167; *People* v. *Whitesell,* 262 id. 387; *Lake Fork Drainage District* v. *Highway Comrs.* 292 id. 340.) By section 62 of the Farm Drainage act as amended in 1885, the commissioners of special drainage districts were required to make out, sign and file with the clerk a tax list, and an appeal was given to every person against whose lands a tax had been thus levied, to the county court, in the same time and manner and upon the same ground as provided in section 27. (Laws of 1885, p. 100.) Section 27 provided for appeals from the assessment of commissioners of districts having a system of combined drainage in one town to the county court upon the ground, only, that the tax was in a greater amount than the benefits to accrue to the land. (Laws of 1885, p. 87.) Section 27 was repealed in 1901 (Laws of 1901, p. 148,) and section 62 was amended, omitting the provision for an appeal as provided in section 27. After the taking away of the right of appeal given by section 27, the land owner had a right to object to judgment against his land for an assessment on the ground that the assessment exceeded the benefits, for the

reason that under the Drainage law the application for judgment gave the first opportunity for raising that question before a tribunal authorized to determine it. (*People* v. *Carr*, 231 Ill. 502; *People* v. *Welch, supra; People* v. *Whitesell, supra; People* v. *Garner*, 267 Ill. 396.) In 1915 section 27 was re-enacted with slight changes, so that an appeal was again given in the case of a tax levied in accordance with section 26 in districts organized in a single township under section 11 of the Drainage act. The section was given the same construction as was given to the old section before its repeal, and it was held that the question of the amount of the benefits could be determined by an appeal from the confirmation of the assessment and could not be raised on the application for judgment. (*People* v. *Bradshaw*, 303 Ill. 558; *People* v. *Meyers*, 124 id. 95; *People* v. *Chapman*, 128 id. 496.) In the *Bradshaw case* the district was a union drainage district, but the question was not raised that the appeal granted by section 27 was only in case of districts organized under section 11, and the case is therefore not an authority for the proposition that the appeal allowed by section 27 applies to special drainage districts. Clearly it does not, for since an appeal was originally given by section 62, (the reference to section 27 being only in regard to the time, manner and grounds of the appeal,) the striking out of all reference in section 62 to an appeal took away the right, and it could not be restored by the re-enactment of section 27, which did not purport to give the right. It was error to strike objections 1 and 2 as to the amount of the benefits.

The payment by some of the land owners of the first installment of the assessment did not estop them from objecting that their lands were assessed more than they were benefited. *People* v. *LeTempt*, 272 Ill. 586; *People* v. *Schwartz*, 284 id. 159; *People* v. *DeYoung*, id. 530.

Other questions in regard to the effect of estoppel and the curative act are not considered because they are not ap-

plicable to the case. If the land owners' objections were held valid it might be necessary to consider those questions, but since we hold that the objections are not valid, questions of estoppel do not arise.

The judgments will therefore be reversed and the cause remanded to the county court, with directions to grant a trial of the objections as to the amount of benefits.

*Reversed and remanded, with directions.*