THE PEOPLE *ex rel.* Joseph Mann, County Collector, Appellee, *vs.* W. C. ALLEN *et al.* Appellants.

*Opinion filed April 21, 1928—Rehearing denied June 18, 1928.*

1. DRAINAGE—*when rule that objectors may compel adequate drainage cannot be applied to validate assessment.* Before a tax for drainage will be held invalid because of want of benefits arising from an insufficient outlet it must appear that the outlet can not be made adequate for an amount equal to the benefits to the lands affected; but this rule cannot be applied where the objectors' lands are so situated that they are already sufficiently drained and where the purported improvement for which the assessment objected to is levied would in no way improve their drainage, with or without a sufficient outlet.

2. SAME—*what necessary to enable land owners to compel additional work.* Land owners may compel commissioners to provide outlets with ample capacity for the waters of the district, but in order for a land owner to successfully maintain *mandamus* and compel the doing of additional work he must show that his land does not receive sufficient drainage and that additional drainage can be furnished.

330—28

3. SAME—*land owner entitled to natural drainage from higher to lower level.* An owner of property is entitled to enjoy it with such natural advantages as are derived from its situation, and he is under no obligation to assist the owner of a servient estate to get rid of the water flowing onto the latter's land.

4. SAME—*what necessary to a valid assessment.* To be subject to assessment for a drainage project, lands must be thereby rendered more productive, more accessible, or their market value substantially increased and their actual or intrinsic value enhanced.

5. SAME—*land owner not necessarily subject to assessment for improvement because his property is within district.* Because land owners are joined together in a drainage district affords no reason why all must contribute to every improvement which may assist in the drainage of the district, but the relative location of the lands and the benefits to accrue from the improvement must be considered, and it is not enough that the lands are in the same watershed.

6. SAME—*when contract with railroad company does not preclude assessment.* The fact that drainage commissioners have contracted with a railroad company for the filling of certain openings or trestles in a railroad embankment at the expense of the railroad, making the embankment a part of the levee of the district, is not a valid objection to assessments against lands benefited by the filling in of the trestles, where the work is done in consideration of the construction of a levee by the district which will benefit the railroad company.

7. SAME—*when signing of a petition does not estop objectors.* The signing of a petition requesting the drainage commissioners to contract with a railroad company for the use of the company's embankment as a part of the levee of the district in return for the construction of an additional levee by the district, which would protect the railroad, does not estop objectors whose lands are in no way benefited by the improvement nor by the use of the embankment as a levee, as it is not the signing of a petition to initiate an improvement but is merely the signing of a request to proceed with the joint enterprise and does not affect the rights of the parties in the improvement proceeding.

APPEAL from the County Court of Whiteside county; the Hon. WILLIAM A. BLODGETT, Judge, presiding.

W. C. ALLEN, and WOOD, McNEAL & WARNER, for appellants.

ROBERT W. BESSE, State's Attorney, McMAHON & BELL, and McCALMONT & RAMSAY, for appellee.

Per CURIAM: The Whiteside and Rock Island Special Drainage District, located principally in the southwest portion of Whiteside county but extending into the northeast portion of Rock Island county, was organized in 1883 under the Farm Drainage act of 1879. In 1919 an additional or supplemental improvement was inaugurated. In 1924 an application was made by the collector in the county court of Whiteside county for a judgment and order of sale against certain lands in the district which were in default in the payment of the 1924 installment of the special assessment. The judgment rendered in that case was reversed on appeal to this court and remanded for a hearing on the question of benefits. (*People* v. *Allen,* 317 Ill. 92.) Reference is made to the opinion on that appeal for a detailed description of the territory embraced within the district. Upon the filing of the remanding order the cause was consolidated with the application made by the collector for judgment for the installment due January 1, 1925. The objectors filed objections to both installments, claiming (1) that their lands received no benefits and (2) that the assessments exceeded the benefits. On a hearing the county court held that the lands of some of the objectors were benefited to the full amount of the assessment, that some were benefited a portion of the amount assessed, and that some received no benefit. All of the objectors, except Brewer and Mason, against whose lands benefits were assessed have appealed. The district has appealed from the judgment as to all land held to have received no benefit and as to all land held to be partially benefited. The two appeals have been consolidated in this court.

July 11, 1917, sixty-two land owners, including objectors E. H. Chamberlain, John Dobers, J. Scott Hyde, Harry O. Beardsworth and George Klendworth, presented

a petition to the commissioners, reciting that the petitioners had learned of negotiations between the commissioners and the Chicago, Burlington and Quincy Railroad Company concerning a proposed contract by which the railroad company agreed to allow the district to use its embankment from the village of Erie southwest to the section line between sections 14 and 15 in the town of Erie as a dike to prevent Rock river from overflowing said district, the company to fill all openings in the railroad embankment and keep them closed. By the contract the district obligated itself to construct a dike south along the section line aforesaid, a distance of a mile and a half, to the north bank of Rock river and then west two miles along a public highway to high ground at the hamlet of Hillsdale, at the southwest corner of the district, and place therein a suitable culvert, with proper flood-gates, which could be operated to keep Rock river from flowing into the district when the river was high and to allow the water to flow from the district into the river when the river was low. The petition requested the commissioners to enter into such a contract with the railroad company and to proceed without delay with the improvement. The purpose of this drainage district, as shown in the order organizing it, was to construct and maintain drains, ditches and embankments within the district for agricultural and sanitary purposes. The district contains about 16,400 acres, and there are more than 20,000 acres of adjoining land of higher elevation which drain into the district. Reference to the accompanying plat will show the lands affected and their relation to the proposed improvement. The lands of the objectors are designated on the plat by circles, crosses, and crosses within circles. The tracts found by the county court to be benefited the full amount of the assessment are marked by a circle; those found to be partially benefited, by a cross within a circle; and those found not to be benefited at all, by a cross.

Rock river lies south and east of the district and flows in a southwesterly direction. The village of Erie is on the railroad on the sand ridge which extends into the district from the east and separates the lands of the objectors in the north side of the district from those in the south side. There is a dike at the east end of Lake Erie connecting the two sand ridges.

The special assessment to which objection is made was levied to pay for the cost of the dike south of the railroad,

the flood-gates consisting of a concrete frame and four steel gates, each five by five feet, and the dredging of the slough from the railroad embankment to Rock river. In making the assessment for this improvement the Quade forty, being the southwest quarter of the southeast quarter of section 10 in township 19 north, range 3 east of the fourth principal meridian, was taken as zero, or lands unaffected by the improvement. The scale of classification for the assessment does not appear in the abstract. It does appear that the benefits were computed on a scale of 100 for full benefits and zero for no benefits. Both the district and the objectors had their own surveyors and each used a different datum plane for their elevations, but, as there is no material difference in their findings when reduced from one to the other, we have used the plane adopted by the objectors' engineers, which is a plane 100 feet below the top of the wall of the bulkhead of the flood-gates. The Quade forty, as to which it was agreed no benefits were derived by the im · provement, has a level of 96.5. There is no evidence in the record that the water of Rock river has ever reached that height, the highest water shown being at a level of 95, or one and one-half feet below the elevation of the Quade forty. Originally the lands lying in this district were inundated by water coming from different sources. The northeast portion of the district, which includes the lands of all the objectors before this court except Jensen, Hyde and Klendworth, was overflowed by waters coming in from the east and northeast of the district from Rock creek and Rock river. The Fenton dike shown on the plat, and the dike built at the head of Lake Erie, kept the waters of Rock creek out of the district, and the weight of the testimony shows that since the building of these dikes the lands of the objectors lying north of the sand ridge have never been inundated. Prior to the last improvement the railroad company had six openings or trestles in its grades between Erie, on the east side of the district, and Hillsdale, at the south-

west corner of the district.   In times of high water Rock
river backed into the district through these openings, and
the evidence shows that the lands lying south and west of
the sand ridge, including those of objectors Jensen, Hyde
and Klendworth, were submerged.   Practically all of these
lands are from six inches to three feet lower than high-
water elevation 95.   The elevations shown by the evidence
and the contour maps in the record show that only a small
portion of the lands lying north of the sand ridge is lower
than elevation 95, and all these lands lie along the ditch
known as the South Branch ditch and vary from one and
two-tenths feet to seven-tenths of a foot lower.   The evi-
dence establishes that the waters from Rock river coming
into the district through the openings of the railroad em-
bankment could not find their way around the west end of
the sand ridge so as to inundate the objectors' lands in the
north side of the district.   It is further shown that the ele-
vation of the bottom of the natural water-course at the
railroad is 85.77, and the elevation of the lands of the ob-
jectors north of the sand ridge in the district vary from
substantially 95 to 103.   There is a general fall toward the
flood-gates in the line of the ditches, which are about eight
miles long.

The collector contends that the widening and the deep-
ening of the main ditch outlet have facilitated the drainage
of water through the ditches and therefore benefit the lands
at the north end of the district, but the evidence does not
support the contention.   It appears that in a natural state
the lower part of the district is servient to the lands of the
upper part for the discharge of waters, and that at the out-
let of the old Dosia the land is a low marsh and any fall
toward the river is imperceptible.   The original system of
drainage was a system of gravity drainage.   It was oper-
ated for thirty-six years before this proceeding was insti-
tuted to alter or enlarge the improvement.   The lower part
of the district was a swamp, which, due to the natural lay

of the land, was under water in wet seasons with no way of being drained. The original ditches and system of drainage were no doubt a benefit to all the lands of the district, but in wet seasons the south end was inevitably the sufferer from excess water. The original system of drainage accomplished the purpose for which it was created and the evidence shows that most of the land was reclaimed for tillage. It served the objectors north of the sand ridge as efficiently as the enlarged improvement serves them. All the objectors contend that the drainage of the land in the lower end cannot be accomplished by the improvement for which this assessment is levied. It will take care of the situation in dry weather, but then no drainage is necessary. In times of high water, with the embankments and flood-gates closed, the inevitable result will be the impounding of water in the district. All the engineers, including the engineer for the district, testify that this improvement will not be complete until there is a pumping plant established to discharge the waters held back by the embankment and the flood-gates.

It has been held in this State that before a tax for drainage will be held invalid because of want of benefits arising from an insufficient outlet it must appear that the outlet can not be made adequate for an amount equal to the benefits to the lands affected. (*People* v. *Coudy,* 296 Ill. 263; *People* v. *Garner,* 275 id. 228.) Land owners may compel the commissioners to provide outlets with ample capacity for the waters of the district. (*Stoddard* v. *Keefe,* 278 Ill. 512; *Langan* v. *Milk's Grove Special Drainage District,* 239 id. 430.) The collector cites these cases in support of his application for judgment, but they are applicable only to a situation where it is practicable to complete the original plan of improvement or to correct insufficiencies of the original project. In the present case, however, it unquestionably appears that in the original proceedings an outlet for the water from the lower portions of the district was not contemplated. The difficulty is that these lands are too low

to be completely drained by gravity drainage. Under the original scheme each tract of land in the district had received benefits in proportion to the amount assessed against it. Even the lowest land in the district had been changed from what was for all practical purposes a swamp, so that the largest part of it could be cultivated in dry seasons. The improvement involved in this proceeding changes the scheme of drainage, substituting drainage by a pumping plant for that of gravity drainage. The benefits to be derived would be confined to a small portion of the district, being that portion too low to be completely drained by gravity. Not only does it appear that the added improvement does not assist the drainage of the lands in the higher part of the district, but the evidence shows that such improvement without a pumping plant is a menace to the district. The openings in the flood-gates are insufficient to permit the escape of the water from the district, and, in case of complete saturation of the district followed by a maximum 24-hour rainfall over the watershed, the dike would form an impounding barrier and hold the water in the district at a level almost five feet above the highest water ever known in the vicinity. If the construction of a ditch will not drain a tract of land any better than is done by natural watercourses or render it more accessible or affect its immediate surroundings, then it is not benefited even though the ditch may carry off the water. When lands are so situated there is imposed on those below, the natural burden of receiving such waters as naturally flow therefrom. The reason for this is that the water naturally descends, so that in the course of nature it must flow from a higher to a lower level, and the owner is entitled to enjoy his property with such natural advantages as are derived from its situation and is under no obligation to assist the owner of a servient estate to get rid of the water flowing onto his land. (*Sangamon and Drummer Drainage District* v. *Houston,* 284 Ill. 406; *Blue* v. *Wentz,* 54 Ohio St. 247, 43 N. E. 493; *Zinser* v.

*Board of Supervisors,* 137 Iowa, 660, 114 N. W. 51; *Beals v. James,* 173 Mass. 591, 54 N. E. 245.) In order to be assessed for a drainage project, lands must be thereby rendered more productive, more accessible, or their market value substantially increased and their actual or intrinsic value enhanced. (*Sangamon and Drummer Drainage District* v. *Houston, supra.*) Under the facts in the record there is no evidence showing that the lands of the objectors north of the sand ridge were rendered more productive, more accessible, or that the market value was substantially increased. The objectors north of the sand ridge were benefited by the first improvement because the ditches were dug in such a way as to facilitate the drainage of their lands through the natural water-courses to the swale at the lower end of the district. The present proceeding is to drain the low, wet lands, which would benefit only the land owners in the south portion of the district, and those not benefited cannot be assessed to pay for the improvement.

Relying on the same authorities, counsel for the collector contend that an adequate system can be provided by the installation of a pumping plant, and before objectors can successfully defend against his application for judgment they must show affirmatively that no additional improvement can be made which will make the system efficient for drainage of their lands. The pumping plant could not be installed without complying with the act of June 27, 1913, authorizing such installation. (Cahill's Stat. 1927, p. 1009.) Proceedings to affect the improvement must be initiated by designated persons and the advisability of the project must be judicially determined by a court of record after full hearing. The commissioners have no power to install a pumping plant until the court orders it done. Until the order is entered the commissioners cannot be compelled by *mandamus* to make the improvement. (*Clear Creek Drainage District* v. *St. Louis, Iron Mountain and Southern Railway Co.* 264 Ill. 640; *Title Guarantee and Trust Co.* v. *City of*

*Chicago,* 162 id. 505; *Hult* v. *City of Chicago,* 132 id. 352.) Where a plan of drainage has been inaugurated and is found to be incomplete or insufficient, no doubt the authorities upon which the collector relies may be invoked to protect the land owners, but they have no application to a case where an entirely new and different character of improvement is necessary. In order for a land owner to successfully maintain *mandamus* and compel the commissioners to do additional work he must show that his land does not receive sufficient drainage and that additional drainage can be furnished. (*Stoddard* v. *Keefe, supra.*) None of the objectors north of the sand ridge could show that their land did not receive adequate drainage or that the purported improvement, with or without a pumping plant, would in any way improve their drainage. Because land owners are joined together in a drainage district affords no reason why all land owners must contribute to every improvement which may assist in the drainage of the district. The relative location of the lands and the benefits to accrue therefrom must be considered. It is not enough that the lands are in the same watershed. *Sangamon and Drummer Drainage District* v. *Houston, supra; People* v. *Barber,* 265 Ill. 316.

The contention that the assessment against the lands north of the sand ridge can be sustained on the ground of improved sanitation is not borne out by the evidence, because these lands are miles from the low lands affected by the supplemental improvement. The evidence also fails to show any advantage to such objectors by the alleged protection of fences from overflow, the protection of the ditches or the prevention of washouts. In fact, the objectors were better protected before the levee and gates were installed, because the water was not then impounded in the district.

We are of the opinion that the finding and judgment of the county court that the lands of the objectors north

of the sand ridge were benefited by the improvement in question are manifestly against the weight of the evidence, and their objection that they receive no benefits from the improvement should have been sustained.

As to the lands of objectors Jensen, Hyde and Klendworth, lying south and west of the sand ridge, it is clear that the filling of the openings in the railroad embankment has been beneficial in times of high water in preventing the water from Rock river from overflowing their lands. It is urged, however, by these objectors that the contract with the railroad company and the work done thereunder do not afford a valid basis for an assessment against their lands, because the filling of the openings in the railroad embankment was done without cost to the district and the levee built outside of the district was for the benefit of the railroad company. This contention is without merit. While the railroad company filled the openings in its embankment at its expense, it was done in consideration of the building by the district of the dike.to the south of its right of way. Counsel for objectors state that the consideration for the use of the railroad embankment was not the construction of a levee but the obligation of the district to pay the railroad company for any reinforcement of the embankment. We think counsel are in error. There are several elements of consideration in the contract, and the building of the levee was one of them. We must take the contract as it is, and we have no right to assume that the consideration was anything different from what the terms of the contract show it was. By the contract the railroad embankment became a part of the levee of the district. The commissioners had as much right to acquire a levee in the manner designated in the contract as in any other manner. The court properly held these lands were benefited the amount assessed against them.

The collector contends that certain of the objectors were estopped by reason of their signing the request that the com-

missioners proceed with the joint enterprise with the railroad company. The petition signed by the objectors was not the petition under which the proceeding herein was initiated. It amounted to no more than a request to the commissioners and certainly could not conclusively bind those signing it. It would necessarily be contemplated that if such a proceeding were had in response to the request it would be initiated in the usual way and the parties affected would have all the rights that people ordinarily have in proceedings affecting their land. The authorities upon which counsel for the collector rely are cases where litigants in court received the precise relief for which they prayed and were consequently held estopped to appeal from such a judgment, but they have no application to the situation here presented.

It is claimed that the court committed reversible error in permitting witnesses Quade and Seger to use written memoranda showing the increase in the market value of the respective tracts affected, the contention being that the witnesses, independent of such memoranda, had no knowledge on the subject. As to the witness Quade the record does not show what the memorandum contained. Counsel for objectors had it marked "Objectors' Exhibit 11" and offered it in evidence, but it was not admitted. It does not appear in the abstract and without it we cannot pass on the objection. There is nothing in the record to show what was on the memorandum of witness Seger except his statement that it related to values. The document is not before us and there is therefore nothing to review.

Complaint is made of the striking of parts of the evidence of objectors' witnesses and the limitation of the cross-examination of the collector's witnesses. This case was heard by the court and the record is voluminous. It is hardly possible to maintain technical accuracy in a trial lasting many days. We do not believe that objectors were prejudicially affected by any of the rulings of which complaint is made.

The judgment of the court as to the lands of the objectors held to have received no benefits and as to the lands of Jensen, Hyde and Klendworth is affirmed. The judgment as to the lands of other objectors is reversed.

*Affirmed as to some and reversed as to others.*